Filed 3/30/21  Solano Transportation Authority v. Anderson CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SOLANO TRANSPORTATION AUTHORITY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ARTHUR L. ANDERSON et al.,<br><br>    Defendants and Appellants. | A156167<br><br>(Solano County<br>Super. Ct. No. FCS044861) |

In this eminent domain action, the trial court entered judgment awarding defendants Arthur L. Anderson, Matthew T. Archer, and Dunnigan Hills Farming Company (collectively, the Anderson Parties) $8,100 as compensation for the taking by plaintiff Solano Transportation Authority (the Authority) of real property belonging to the Anderson Parties.  The Anderson Parties appeal, alleging the court erred in (1) granting several motions in limine excluding expert testimony at trial, (2) delaying its consideration of their ex parte request to continue the expert exchange date, and (3) untimely hearing and determining, and ultimately overruling, their objections to the Authority's right to take the property.[1]  We affirm.

_____

[1] The Anderson Parties filed their opening brief on July 1, 2020.  On July 20, 2020, the Anderson Parties filed an "Errata to Appellants' Opening

# I. BACKGROUND

## A. *The Subject Property and Underlying Dispute*

By this eminent domain action, the Authority sought to acquire fee title ownership to a narrow strip of land bisecting the Anderson Parties' roughly 568-acre property located in the Suisun Marsh, south of Fairfield, along Chadbourne Road, as well as temporary construction easements. The Authority's goal was to construct in the narrow take area a north-south running water conveyance system, consisting of a weir, earthen channel, and related improvements, to transfer water from a reservoir or canal at the north end of condemned strip, south through the Anderson Parties' property, bringing the water into an environmental mitigation site. This mitigation site was designed to compensate for habitat/species impacts from a transportation highway project known as "I-80/I-680/State Route 12 Interchange Project" in Solano County (Interchange Project).[2]

The Anderson Parties claim they had plans to develop their property by converting it to a mitigation bank which would generate income to them in the form of sales of environmental credits. They contend that the mitigation

---

Brief." After the Authority moved to strike the errata, which the Anderson Parties opposed, we ordered the Anderson Parties to notify us as to which brief it intended to use as the opening brief. The Anderson Parties elected to have its original opening brief stricken and to have the errata serve as the opening brief. We therefore refer to the arguments raised in the errata.

[2] Acquiring and developing real property to serve as a mitigation site, and obtaining a water supply for the site, was required as part of the environmental review for the Interchange Project. Federal and California law require a proponent of a project to analyze the environmental impacts of the property and measures to mitigate any impacts. (See Pub. Resources Code, § 21002; Cal. Code Regs., tit. 14, § 15126.4; 32 C.F.R. § 651.15 (2020).) Mitigation can include avoiding, minimizing, rectifying, reducing, or eliminating the impact, or compensating for the impact. (Cal. Code Regs., tit. 14, § 15370; 32 C.F.R. § 651.15 (2020).)

project they wish to pursue "depends on creating new, equivalent tidal channels and flows on the east and west sides of the [condemned strip]." On the west, they argue, this involves breaching an existing levee along Suisun Creek and constructing an east-west running channel into the Anderson Parties' property. In their view, however, the Authority's north-south water conveyance project conflicts with and prevents them from proceeding with their own plans to develop the strip as a mitigation bank.

**B.** *Precondemnation Events*

In order to meet the environmental mitigation conditions imposed in connection with the Interchange Project, the Authority contracted with Grizzly Bay LLC (originally Water Hole Land Company Inc.) (Grizzly Bay), which had purchased property adjacent to the Anderson Parties' property to serve as a mitigation site. Obtaining the narrow strip bisecting the Anderson Parties' property was necessary so that the Authority could direct the flow of water to certain areas within the mitigation site and so that it could make improvements facilitating that objective.

On January 14, 2015, the Authority's Board, after holding a hearing, adopted a resolution of necessity authorizing the acquisition of about 61,435 square feet (1.41 acres) in fee title of the Anderson Parties' real property, as well as 8,202 square feet (0.19 acres) in temporary constructive easements. On February 6, 2015, the Authority then filed a notice that a deposit of probable compensation in the amount of $8,300 had been made with the State Treasurer.

**C.** *The Eminent Domain Action and Motion To Specially Set a Trial on Right-to-take Objections*

On February 6, 2015, the Authority filed this action in eminent domain. On that same day, the Authority moved for prejudgment possession of the Anderson Parties' property.

3

The Anderson Parties then filed an answer to the complaint, asserting numerous affirmative defenses, including those contesting the Authority's right to take their property. The Anderson Parties also opposed the motion for prejudgment possession.

In May 2015, the Anderson Parties moved for orders to specially set a trial on their right-to-take objections and to temporarily stay the Authority's motion for prejudgment possession, pending the outcome of the trial on the right-to-take objections. The Authority opposed the motion, and the Anderson Parties replied to the opposition. The trial court granted the Authority's motion for prejudgment possession and denied the Anderson Parties' motion to specially set a trial and stay the motion for prejudgment possession.

## D. *Ex Parte Application To Continue the Expert Exchange Date*

Over three years later, on July 24, 2018,[3] the Anderson Parties filed an ex parte application to continue then-pending July 26 expert exchange and September 19 trial dates. In their application, the Anderson Parties noted that the parties had been engaged in extensive settlement discussions over the past two years. In the course of those discussions, the parties agreed multiple times to continue the expert exchange date. As of July 19, the parties were unable to finalize their settlement efforts. The parties again agreed to continue the exchange date to July 23, and then to July 26. But the Authority declined the Anderson Parties' request to continue the exchange date beyond July 26. The Authority opposed the ex parte application.

On July 31, the trial court conducted a hearing, explaining there was "a new rule of court for the civil division where we have a hearing to see if we would set it for an ex parte hearing . . . to consider a motion to continue this

---

[3] All further dates refer to the year 2018 unless otherwise stated.

4

matter which is currently set for trial." The court then scheduled a hearing on the Anderson Parties' motion to continue for August 24 and ordered the parties to file moving and opposing papers in accordance with a briefing schedule set by the court. One week later, the Anderson Parties requested the court take the matter off calendar.

**E. *Expert Exchange***

The parties proceeded with the expert exchange on July 26. The Anderson Parties submitted their list of experts, which included Jeffrey Kauttu, an appraiser; Tim DeGraff, a wetlands and biology consultant; and Arthur Anderson, whose company was an owner of the subject properties.

The Anderson Parties explained that DeGraff would testify about the conditions and characteristics of their property and the property adjacent to it, "the . . . feasibility of the relevant properties' highest and best use(s)," the impacts of the taking on the Anderson Parties' property, and the suitability of the property as a "mitigation bank."[4] DeGraff previously had prepared the "Rancho Suisun Conservancy Mitigation Bank Draft Prospectus" (Draft Prospectus), a plan for developing and constructing the Anderson Parties' property into a mitigation bank.

---

[4] "Mitigation banking has been defined as wetland restoration, creation, enhancement, and in exceptional circumstances, preservation undertaken expressly for the purpose of compensating for unavoidable wetland losses in advance of development actions, when such compensation cannot be achieved at the development site or would not be as environmentally beneficial. It typically involves the consolidation of small, fragmented wetland mitigation projects into one large contiguous site. Units of restored, created, enhanced or preserved wetlands are expressed as 'credits' which may subsequently be withdrawn to offset 'debits' incurred at a project development site." (Lindgren & Mattas, Cal. Land Use Practice (Cont.Ed.Bar 2020) Mitigation Banks, § 14.26.)

The Anderson Parties indicated that Kauttu would "testify as a valuation witness" and attached his statement of valuation data. Kauttu opined that the highest and best use of the Anderson Parties' property was "wetland mitigation banking." Kauttu concluded the Anderson Parties were entitled to severance damages in the amount of $5,099,000 and just compensation in the amount of $5,122,000.

On August 16, Kauttu's deposition was taken, and the Anderson Parties served Kauttu's updated statement of valuation data. This time, Kauttu determined the Anderson Parties were entitled to $2,975,000 in severance damages and $2,998,265 in total just compensation.

The Authority also served the statement of valuation data of its appraiser, Terry Larson, who determined that the highest and best use of the property is for irrigated crops. Larson concluded that the Anderson Parties were entitled to severance damages in the amount of $500, with total just compensation in the amount of approximately $8,100.

Both Kauttu and Larson used January 26, 2015, as the date of valuation, the date that the Authority deposited the probable compensation. (Code Civ. Proc., § 1263.110, subd. (a).)[5]

### F. *The Authority's Motions in Limine*

On August 17, 2018, the Authority filed motions in limine nos. 1 and 2. Motion in limine no. 1 sought to exclude Kauttu's valuation opinions based on a method known as the "developer's approach." Motion in limine no. 2 sought to exclude evidence of "sales and other data" related to other properties that Kauttu used to value the Anderson Parties' property.

---

[5] All further undesignated statutory references are to the Code of Civil Procedure.

6

On September 14, the Authority filed further in limine motions. "Supplemental" motion in limine no. 1 sought to exclude additional opinions of Kauttu relying on the "developer's approach" that were made after his original appraisal. Motion in limine no. 3 sought to exclude additional opinions of Kauttu that the Anderson Parties had failed to timely disclose. (§ 1260.010 et seq.) Motion in limine no. 4 sought to exclude evidence of a transaction that Kauttu used as a "comparable sale" to value the Anderson Parties' property.

The Anderson Parties filed oppositions to the supplemental motion in limine no. 1 and motions in limine nos. 2, 3, and 4.

After hearing arguments on the motions at the September 14 trial calling, the court granted motion in limine no. 1, but reserved ruling on whether Kauttu's opinions based on the "developer's approach" were admissible to show the Anderson Parties' position on the "highest and best use" of their property; granted motion in limine no. 2 (except as to the admissibility of comparable sales evidence in "Item 8," which is the subject of motion in limine no. 4); granted motion in limine no. 4, but reserved ruling on the admissibility of the "comparable sales" evidence to show "market activity and demand"; and reserved ruling on motion in limine no. 3.

A jury trial commenced on September 19. The Authority filed additional motions in limine to address additional opinions that Kauttu had presented since his August 16 updated appraisal. In its motion in limine no. 5, the Authority sought to exclude the opinions in Kauttu's "updated file memorandum" served on September 14 or 15. The Authority also filed motion in limine no. 6 to "preclude [the Anderson Parties] from offering further evidence of a specific plan of development" through DeGraff and Kauttu.

7

After hearing arguments and conducting an evidentiary hearing, the court granted motion in limine no. 5. As for motion in limine no. 6, the court invited the Anderson Parties to provide an offer of proof as to the testimony of DeGraff. In response, counsel for the Anderson Parties stated, "I don't know that there's anything that he can talk about" and therefore "we may end up having to stipulate to judgment at this juncture."

## G. *Ruling on Right-to-take Objections*

Meanwhile, on September 19, the Anderson Parties requested a hearing for the court to determine and rule on their right-to-take objections. The court agreed to do so and on the following day, heard arguments on the objections. The court overruled the objections.

## H. *Judgment and Appeal*

Following the court's rulings at trial, the parties stipulated to the $8,100 valuation the Authority's appraiser, Larson, had set as the total just compensation due to the Anderson Parties. Upon that stipulation, the trial court dismissed the jury and entered a judgment awarding $8,100 to the Anderson Parties.[6] From this judgment, the Anderson Parties timely appealed.

## II. DISCUSSION

## A. *Overview of Eminent Domain Law*

Under the federal and California Constitutions, "[t]he state's power to take property by eminent domain is conditioned on its obligation to pay 'just compensation' to the owner." (*Emeryville Redevelopment Agency v. Harcros Pigments, Inc.* (2002) 101 Cal.App.4th 1083, 1094 (*Emeryville*); U.S. Const., 5th Amend.; Cal. Const., art. I, § 19.) " 'Just compensation' " is defined as

---

[6] The judgment states that "Defendant Dunnigan Hills Farming Company, Inc. has not appeared at trial and had its default entered on the record on September 26, 2018."

8

" 'fair market value.' " (*Emeryville*, *supra*, 101 Cal.App.4th at p. 1094, citing § 1263.310). "The fair market value of the property taken is the highest price on the date of valuation that would be agreed to by a seller . . . and a buyer . . . each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available." (§ 1263.320, subd. (a).) "The just compensation clause 'is primarily aimed at making a landowner whole for any governmental taking or damage to his or her property.' " (*Escondido Union School Dist. v. Casa Sueños de Oro, Inc.* (2005) 129 Cal.App.4th 944, 958 (*Escondido*).) "[I]t also protects the public by limiting its liability to losses that can fairly be attributed to the taking. ' "A landowner is not entitled to be placed in a better position financially than he was before the condemnation; neither is the state required to pay more than land is worth merely because of some theoretical, intangible concept." ' " (*Emeryville*, *supra*, at p. 1094.)

When the property taken is part of a larger parcel, the owner is compensated not merely for the injury to the part taken but also for the injury, if any, to the remainder. (§ 1263.410, subd. (a); *Metropolitan Water Dist. of So. California v. Campus Crusade for Christ, Inc.* (2007) 41 Cal.4th 954, 965.) Such compensation is commonly called "severance damages." (*City of San Diego v. Neumann* (1993) 6 Cal.4th 738, 741.) "Severance damage is determined by ascertaining the market value of the property not taken as a part of the whole in the before condition and by deducting therefrom the market value of such remainder after the take and the construction of the improvement in the manner proposed by plaintiff." (*San Bernardino County Flood Control Dist. v. Sweet* (1967) 255 Cal.App.2d 889, 904; see § 1263.410, subd. (b).)

9

**B.** *Exclusion of the Defense Appraiser's Valuation Opinions*

The Anderson Parties' challenges largely turn on whether the trial court correctly ruled on the Authority's motions in limine.  Having reviewed the record, we conclude that the trial court appropriately exercised its discretion in excluding the opinions of the Anderson Parties' appraiser, Kauttu.

### 1.  Standard of Review

The trial court enjoys " 'broad authority' " over the admission and exclusion of evidence.  (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 295–296.)  We review for an abuse of discretion the trial court's ruling on a motion in limine to exclude evidence.[7]  (See *Mardirossian & Associates, Inc. v. Ersoff* (2007) 153 Cal.App.4th 257, 268–269.)  We note, however, that the deference the abuse of discretion standard calls for depends on the aspect of the trial court's ruling under review.  Its factual findings are reviewed for substantial evidence; its conclusions of law, such as the interpretation of a statute, are reviewed de novo; and its application of the

---

[7] The Authority cites to *County of Glenn v. Foley* (2012) 212 Cal.App.4th 393 (*Foley*), which provided that "when the nonstatutory procedure of a motion in limine strays beyond its traditional confines and results in the entire elimination of a cause of action or a defense, we treat it as a demurrer to the evidence and review the motion de novo, lest it be used to evade the more exacting standards for such a motion." (*Id.* at p. 398, citing *Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1593–1594 [explaining "nontraditional in limine motions" are those construed as a replacement for dispositive motions].)  Because the motions in limine at issue here were not the result of a "nontraditional" procedure, we do not treat the motions as demurrers.  The Authority's motions were directed at specific aspects of Kauttu's opinions, not the entirety of his proposed testimony.  Apparently, however, the Anderson Parties determined that after the motions were granted, the basis for his valuation was not strong enough to make it worthwhile to proceed.

law to the facts is reversible only if arbitrary and capricious. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712; *Emeryville*, *supra*, 101 Cal.App.4th at p. 1095.) Furthermore, "[i]t is for the trial court, in its discretion, to determine whether the probative value of relevant evidence is outweighed by a substantial danger of undue prejudice. The appellate court may not interfere with the trial court's determination . . . unless the trial court's determination was beyond the bounds of reason and resulted in a manifest miscarriage of justice." (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 596.) "It is the appellant's burden on appeal to show the trial court abused its discretion." (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 957 (*Cahill*).)

With these principles in mind, we turn to the specifics of the in limine motions at issue.

### 2. Motion in Limine No. 2: Exclusion of "Comparable Sales" Evidence

We first address the Authority's motion in limine no. 2, which sought to preclude Kauttu's use of, as evidence of "comparable sales," purchases of other properties by public agencies. Kauttu's updated appraisal referred to eight transactions, labeled as "Items" 1 through 8.[8] The Authority argued that Items 1, 2, 3, 6, 7, and 8, were inadmissible as comparable sales evidence under Evidence Code section 822, subdivision (a)(1). The Authority did not object to Items 4 and 5. The trial granted the motion as to Items 1, 2, 3, 6, and 7 (it ruled separately as to Item 8, which was the subject of motion in limine no. 4).

---

[8] Kauttu's original statement of valuation data contains the same transactions as those in his updated statement of valuation data. We refer to the numbers of the "items" as they appear in the updated statement of valuation data.

11

a. *General Principles on "Comparable Sales" Evidence*

Evidence Code section 816 permits a witness determining the value of property to "take into account as a basis for his opinion the price and other terms and circumstances of any sale or contract to sell and purchase comparable property[.]"  "Under this method, the appraiser identifies sales of properties deemed to resemble the condemned property in relevant respects, and then derives a market value for the condemned property from the prices paid for these 'comparables,' typically adjusting the price to reflect such matters as material differences between the properties and differences in market forces between the time and location of the comparable sale and that of the property being valued." (*Emeryville*, *supra*, 101 Cal.App.4th at p. 1094.)

Evidence Code section 822, subdivision (a)(1) limits such evidence.  It provides that "[i]n an eminent domain . . . proceeding . . . , the following matter is inadmissible as evidence and shall not be taken into account as a basis for an opinion as to the value of property:  [¶] []The price or other terms and circumstances of an acquisition of property or a property interest if the acquisition was for a public use for which the property could have been taken by eminent domain."

Additionally, Evidence Code section 822, subdivision (a)(2) renders inadmissible "[t]he price at which an offer or option to purchase or lease . . . was made, or the price at which the property or interest was optioned, offered, or listed for sale or lease[.]"

b. *The Court Did Not Abuse Its Discretion in Excluding the Sales of Properties to Public Agencies*

Items 1, 2, and 3 refer to sales of properties to the State of California's Department of Water Resources (DWR).  Item 6 refers to a sale of property to the East Bay Regional Park District.  Kauttu noted that the properties were

purchased for mitigation purposes.  Item 7 refers to several bids submitted in response to DWR's request for proposals in 2016.

The parties do not dispute that these properties were acquired for a public use.  (Evid. Code, § 822, subd. (a)(1).)  The Anderson Parties, however, suggest that the acquisitions by the DWR do not fall within the ban of Evidence Code section 822, subdivision (a)(1) because they were for properties which were not taken by eminent domain.  Specifically, the Anderson Parties contend that the DWR was "conditionally stripped of such power, or had adopted its own internal policy or rule prohibiting its use" when it acquired the properties.  They claim that "Kauttu knew DWR had clearly, repeatedly informed said owners in writing that it either did not have, or was not using, any such powers."

As an initial matter, we note that the Anderson Parties fail to provide citations to the record to support their factual statements.  The record citation it does provide—Kauttu's declaration submitted in opposition to another motion in limine—does not mention the DWR or the transactions at issue.  California Rule of Court, rule 8.204(a)(1)(C) requires that appellate briefs "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears."  Accordingly, " '[a]ny statement in a brief concerning matters in the appellate record—whether factual or procedural and no matter where in the brief the reference to the record occurs—*must be supported by a citation to the record.*' " (*Professional Collection Consultants v. Lauron* (2017) 8 Cal.App.5th 958, 970 (*Professional Collection Consultants*).)  " 'The appellate court is not required to search the record on its own seeking error.'  [Citation.]  Thus, '[i]f a party fails to support an argument with the necessary citations to the

13

record, . . . the argument [will be] deemed to have been waived.' " (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 (*Nwosu*).)

Even if we were to overlook the waiver, we would still conclude that the DWR transactions were inadmissible under Evidence Code section 822, subdivision (a)(1). According to the Anderson Parties, "[s]ales to public agencies should be admitted if there's little or no evidence of being forced or compelled[.]" To support this assertion, the Anderson Parties cite to *City and County of San Francisco v. Golden Gate Heights Investments* (1993) 14 Cal.App.4th 1203 (*Golden Gate Heights*) and *Sacramento etc. R. R. Co. v. Heilbron* (1909) 156 Cal. 408 (*Heilbron*). Neither case stands for the proposition advanced by the Anderson Parties.

*Heilbron*, *supra*, 156 Cal. 408 does not address comparable sales evidence, much less announce a rule suggested by the Anderson parties that sales of properties to public agencies are admissible if those sales are " 'not forced.' " The transaction at issue in *Golden Gate Heights*, *supra*, 14 Cal.App.4th 1203, was not compelled by eminent domain power and was not the subject of an eminent domain action at the time of its acquisition. (*Id.* at p. 1207.) In that case, the appellate court rejected the appellant's proposed narrow reading of a former version of Evidence Code section 822, subdivision (a)(1), but in the alternative held that even assuming arguendo the appellant was correct that the "trial court erred by admitting and relying upon evidence of comparable sales consummated under the threat of eminent domain condemnation" (*Golden Gate Heights,* at p. 1210), the error was harmless.

Elsewhere, we have rejected the idea that agency sales may be admissible on a discretionary basis upon a showing that the sales did not take place under the duress of condemnation power. (See *Emeryville*, *supra*,

14

101 Cal.App.4th at p. 1095 [the admissibility of agency sales is not "subject to deferential review as a matter entrusted to the trial court's discretion"].) "Whatever [Evidence Code] section 822(a)(1) means, it does not confer a discretionary power on the trial court.  It categorically excludes evidence of a specified character, subject to a stated exception."  (*Ibid.*)  Phrased in mandatory terms, the statute precludes evidence of any acquisition of property that "*could have been* taken by eminent domain."  (Evid. Code, § 822, subd. (a)(1), italics added.)  Contrary to the Anderson Parties' contentions, for the preclusion to apply, there is no requirement that the property must in fact be taken by eminent domain.  It would have been an abuse of discretion to admit evidence that is categorically inadmissible by statute.

With respect to Item 7, we conclude that the trial court correctly ruled on it as well.  Item 7 refers to several bids submitted in response to the DWR's request for proposals in 2016.  Like the DWR sales, those proposals are plainly inadmissible by statute.  The applicable statutory proscription here, Evidence Code section 822, subdivision (a)(2), renders inadmissible "[t]he price[s] at which an offer or option to purchase . . . was made, or the price[s] at which the property or interest was optioned, offered, or listed for sale[.]"

Despite these statutory bars to admission, the Anderson Parties insist that the exception in Evidence Code section 823 applies to Items 1, 2, 3 and 7, sales of properties to the DWR.  That statute provides, "the value of property for which there is no relevant, comparable market may be determined by any method of valuation that is just and equitable."  In this case, there was evidence of relevant, comparable sales of properties that were not barred by Evidence Code section 822, subdivisions (a)(1) or (a)(2).  Items 4 and 5 of

15

Kauttu's updated appraisal identify two sales to private parties of properties used for mitigation, transactions which the Authority does not challenge. Additionally, Anderson testified at trial to several comparable transactions, including purchase of adjacent property by Grizzly Bay for mitigation development in the amount of $3,000 per acre, as well as his own purchase of another property for mitigation development at $2,000 per acre. Accordingly, Evidence Code section 823 does not assist the Anderson Parties.

        c.  *Motion in Limine No. 4: Exclusion of Contract for Sale of "Turnkey" Mitigation Site*

The Anderson Parties further contend the trial court erred in granting the Authority's motion in limine no. 4 seeking to preclude "Item 8" in Kauttu's updated statement of valuation data. Item 8 refers to a "contract to 'Provide Environmental Mitigation' " between Grizzly Bay and plaintiff in 2012.

"In order to be considered comparable, the sale or contract must have been made sufficiently near in time to the date of valuation, and the property sold must be located sufficiently near the property being valued, and must be sufficiently alike in respect to character, size, situation, usability, and improvements, to make it clear that the property sold and the property being valued are comparable in value and that the price realized for the property sold may fairly be considered as shedding light on the value of the property being valued." (Evid. Code, § 816.) "There can be no absolute formula or definition of what constitutes similar or like property. Certainly, similar does not mean identical. It appears to us that the determination must vary with each particular case." (*People ex rel. Dept. Pub. Wks. v. Silveira* (1965) 236 Cal.App.2d 604, 624 (*Silveira*).) "The admissibility of testimony relating to comparable sales rests largely in the discretion of the trial court." (*San*

16

*Bernardino County Flood Control Dist. v. Sweet*, *supra*, 255 Cal.App.2d at p. 905.) We see no abuse of discretion in the court's exclusion of Item 8.

The Anderson Parties contend that the contract referred to in Item 8 was a sufficiently comparable sale under Evidence Code section 816 because the property contracted for is located "directly adjacent to [the Anderson Parties'] property, similar in character, was sold a few years before this action's date of valu[ation], and—like [the Anderson Parties']—is developed as a mitigation site or bank." It is true that "the sale or contract [was] made sufficiently near in time to the date of valuation, and the property sold [is] located sufficiently near [the Anderson Parties'] property[.]" (Evid. Code, § 816.) But we disagree with the Anderson Parties' contention that the properties were "similar in character."

Item 8 refers to an "Agreement of Purchase and Sale of Turn-Key Mitigation Values." Kauttu explained that "[t]he total sale price [$2,738,350] (and price per acre [$64,280]) reflect the price paid for finished (turn-key) mitigation values." Kauttu further noted the Authority had paid Grizzly Bay an additional $1 million since closing. The Anderson Parties' property, in contrast, was undeveloped. The Anderson Parties had not obtained approval or permits to begin development of their proposed plans. In addition, whereas the Authority had apparently invested $1 million in Grizzly Bay's development, the Anderson Parties' property was not generating any income from its potential as a mitigation site. Moreover, the acquisition in Item 8 was for 42.6 acres of developed land, whereas the Anderson Parties' property sought to be condemned is roughly 1.41 acres (61,435 square feet) in fee title and 0.19 acres (8,202 square feet) in easements. Given the disparity in size and nature of improvements on the two properties, the trial court reasonably concluded Item 8 was not a comparable sale that "may fairly be considered as

17

shedding light on the value of" the Anderson Parties' property. (Evid. Code, § 816.)

In support of their claim to the contrary, the Anderson Parties cite *Escondido*, *supra,* 129 Cal.App.4th 944 and *Foley*, *supra*, 212 Cal.App.4th 393, but those cases do not assist them.

In *Escondido*, the property owner's appraiser relied on the sales of finished lots to value two parcels that were in the process of the development of two manufactured homes. (*Escondido*, *supra*, 129 Cal.App.4th at p. 984.) The public agency contended it was error to allow such evidence because work on the two manufactured homes was not complete when the complaint was filed. (*Ibid*.) The appellate court disagreed, finding that the appraiser properly valued the property based on the assumption that the project was completed and subtracted the cost of completion, which was undisputed by the parties. (*Ibid*.) While there was work to be completed, the owner had gained significant progress in the development project. By the time the complaint had been filed and served, both of the manufactured homes had been delivered on the site and permanently affixed. (*Ibid.*)

*Escondido* is distinguishable. As explained above, the Anderson Parties were in the earliest stages of developing their land and had not obtained approval to begin construction. Also, unlike in *Escondido*, costs for the completion of the project on the Anderson Parties' property had not been ascertained, much less agreed upon by the parties.

*Foley*, *supra,* 212 Cal.App.4th 393, is similarly inapposite. There, the appellate court found that recent sales of orchards were " 'sufficiently alike in respect to character, size, situation, usability, and improvements,' " such that the price " 'may fairly be considered as shedding light' " on the value of a condemned livestock pasture under Evidence Code section 816. (Evid. Code,

18

§ 816; *Foley*, at p. 401, italics omitted.)  The court explained that "the proffered comparable sales did not present the risk of comparing apples with oranges (or high-density residential property with barren land).  It was a comparison of a feasible use of the subject property with recent sales of property used for that purpose, with the differential for the costs of improvements either documented in university studies (the cost of establishing the orchards) or not impossible to determine (the other improvements)." (*Id.* at p. 402.)  Here, in contrast, no verifiable data such as the types of mitigation credits likely to be approved or the price for each credit, existed.  Thus, unlike in *Foley*, "there . . . appear to be insurmountable obstacles to a jury being able to derive a rational value of the comparable properties as bare land." (*Ibid.*)

The Anderson Parties also cite *Merced Irrigation Dist. v. Woolstenhulme* (1971) 4 Cal.3d 478 (*Merced*), which addressed the issue whether the Anderson Parties' property was entitled to be compensated for the project-caused enhancement in value that accrued to the property before it was targeted for acquisition.  Answering that question, our Supreme Court concluded that under limited circumstances, a property owner may properly be compensated for the increase in value, so long as it was not reasonably probable the property being evaluated was anticipated to be taken for the project. (*Id.* at pp. 497–498.)  Further, the Court explained, "[t]he conclusion is particularly viable if an expert appraisal witness can fairly estimate the amount of each of the enhanced sales prices which is attributable to 'project enhancement.' " (*Id.* at p. 501.)  On this record, there is no evidence of "project enhancement" of value based on the factors identified in *Merced*.  The Anderson Parties never purported to rely, as a measure of just compensation, on any appreciation to their property value that may have accrued in

19

anticipation they would reap benefits resulting from their proximity to the Authority's project on Grizzly Bay's property. In addition, the adjustment procedure endorsed by the court in *Merced* is predicated on the appraiser's ability to "fairly estimate" the amount of any adjustment. (*Ibid.*) Where, as here, an appraiser is unable to support his adjustments, evidence of the adjustment should not be admitted.

The Anderson Parties therefore have failed to establish the court abused its discretion in excluding Item 8.

### 3. Motions in Limine Nos. 1, 5, and 6: Exclusion of Kauttu's Opinions Based on the Developer's Approach

The Anderson Parties next challenge the trial court's exclusion of Kauttu's valuation opinions based on his use of the developer's approach. As we explain below, the Authority sought to exclude such evidence through interrelated motions in limine nos. 1, 5, and 6.

a. *General Principles Relating to the Developer's Approach*

"The developer's approach (also known as the 'economic analysis' or 'residual land value' approach) as a method for measuring the fair market value of undeveloped land has been repeatedly held inadmissible by California courts." (*Contra Costa Water Dist. v. Bar-C Properties* (1992) 5 Cal.App.4th 652, 657 (*Bar-C*).) "This valuation method 'starts with the presumed value of the finished product, such as a house tract, apartment complex or commercial building. The developer then subtracts costs of marketing the product, building the improvements, and obtaining development entitlements to end with the portion of the finished product value attributable to the land. This residual land value guides the amount a real estate developer will offer to purchase land.' " (*San Diego Gas & Electric Co. v. Schmidt* (2014) 228 Cal.App.4th 1280, 1291; accord, *Silveira, supra*, 236 Cal.App.2d 604.)

20

"While it is recognized that the suitability of condemned acreage for development as a subdivision is a *factor* which may properly be *considered* in determining fair market value, our courts have held that 'it is not proper to place a valuation upon property which is suitable for subdivision taking the market value of contemplated lots and subtracting therefrom the cost of subdivision.'" (*Bar-C, supra*, 5 Cal.App.4th at pp. 657–658; *Buena Park School Dist. v. Metrim Corp.* (1959) 176 Cal.App.2d 255, 260.) "[E]vidence of value in terms of the money which the land would bring for a specific purpose or as a result of a projected specific plan of development is not admissible as an element in determining such market value." (*Silveira, supra*, 236 Cal.App.2d at p. 627; accord, *Santa Clara County Flood Control & Water Conservation Dist. v. Freitas* (1960) 177 Cal.App.2d 264, 267; see § 1263.330, subd. (a) ["[t]he fair market value of the property taken shall not include any increase or decrease in the value of the property that is attributable to . . . [¶] . . . [t]he project for which the property is taken"].)

As explained in *Bar-C, supra*, 5 Cal.App.4th 652, "[t]he rationale for this rule is that the expenses of completing the subdivision, improving the land, laying out streets, holding it and paying out taxes and interest until the lots are sold are far too uncertain and conjectural to allow finished subdivided lot prices to be used as a basis for computing value." (*Id.* at p. 658.)

Thus, in *Bar-C, supra*, 5 Cal.App.4th 652, the appellate court upheld the trial court's refusal to admit testimony of the landowner's appraiser who sought to value the raw land based on the sale prices for finished subdivision lots, reduced by the estimated cost of developing the land. (*Id.* at p. 657.) Even though the landowners obtained tentative map approval and a preliminary public report from the California Department of Real Estate, the

21

eventual outcome of the owners' plans was considered too uncertain and conjectural to allow a valuation as if the subdivision were complete. (See *id.* at pp. 658–659.)

      b. *Factual Background*

The procedural history of the Authority's motions in limine nos. 1, 5, and 6 is convoluted, in part because Kauttu provided multiple valuation opinions before and during trial, which the trial court explained had "ke[pt] metamorphosing."

The various iterations of Kauttu's opinions are his: (1) July 26 statement of valuation data; (2) August 16 updated statement of valuation data; (3) testimony at his August 16 deposition; (4) September 14 or 15 "updated file memorandum"[9]; and (5) testimony at an evidentiary hearing during trial.

In his July 26 statement of valuation data, Kauttu appraised the Anderson Parties' fee acquisition of the property at $21,150; the remainder of the Anderson Parties' property before the taking at $8,499,000; and the remainder after the taking at $3,400,000. He determined that the Anderson Parties were entitled to $5,099,000 in severance damages and $5,122,000 in total just compensation.

Kauttu valued the property as if it were a mitigation bank that could generate income through the sale of mitigation credits. Specifically, Kauttu identified the types of mitigation credits that were available in the "before condition" of the Anderson Parties' property over the course of eight years, using the January 26, 2015 date of valuation. They included tidal wetlands, seasonal wetlands, and oak woodland. Kauttu also provided the number of credits available, as well as the retail price, for each type of credit. For

---

[9] This memorandum is not included in the appellate record.

example, in year four,[10] Kauttu determined roughly 327 mitigation credits were available in the "before condition" and 129 mitigation credits in the "after condition." He then calculated the gross revenues derived from sales of those credits and subtracted marketing costs based on 7 percent of the revenue, to arrive at a total gross income of $11,344,815 in the "before condition" and $6,229,815 in the "after condition." Kauttu then determined the total amount of expenses and subtracted that amount from the income to obtain the net income and in turn multiplied that number by a "present value" percentage to determine the present value of the property.

On August 16, the Anderson Parties served Kauttu's "(Updated) Statement of Valuation Data," which used the same January 26, 2015 date of valuation, but included his projected valuations over the course of ten years. In his updated appraisal, Kauttu's valuations of severance damages and total compensation had decreased. Kauttu valued severance damages in the amount of $2,975,000 and total just compensation in the amount of $2,998,265. In addition to the types of mitigation credits noted above, Kauttu opined that the property in its "before condition" also could generate income through riparian and stream credits.

Kauttu's deposition was taken on August 16. Kauttu acknowledged he was familiar with the "subdivision development methodology" addressed in *Bar-C* that was considered "too speculative." He then testified that based on his "experience in California," the income approach "can't be used as a primary approach to value so my wings are clipped a little bit."

---

[10] Kauttu testified at his subsequent deposition that the Anderson Parties were in "the very . . . beginning steps" of a four-year mitigation approval process.

23

Kauttu attempted to explain the method for his valuations. Kauttu, however, gave differing responses concerning use of the "income approach."[11] Initially, he explained his method was two-fold, noting that he first used a "sales comparison approach," which required him "to use sales that are broader in time, location, [and] use." He then used the "income approach," which was "apply[ing] a bracketing" or "secondary" methodology to "corroborat[e]" the values he obtained by using the "the sales comparison" approach.

Other times, however, Kauttu stated that he did not use, nor did he need to use, the income approach. But when later asked if "the income approach was essential to coming up with [his] opinion of severance," Kauttu stated, "[I]n my opinion it was the best tool to use as an indicator of the impact on value and on a percentage basis." Kauttu testified, "There is no sales comparison approach data that you could use on a paired sales basis to inform that estimate. . . . So it . . . required me to come up with a reasonable approach." Kauttu further testified he "had to find a tool to use to determine how much a property decreases in value when you take half the credits away."

Kauttu also testified that he had relied on DeGraff's opinions, and particularly the Draft Prospectus. For example, when asked where he "c[a]me up with the price for . . . a stream linear foot credit," Kauttu responded, "The total number of credits is an element of design" and that "[i]t's in the prospectus."

---

[11] Indeed, the court explained at trial, "[I]t's really hard to make heads or tails of what Mr. Kauttu was saying in his deposition. And I would think that he would be the most motivated to be clear during his deposition." Defense counsel also commented, "[Kauttu] says things that half the time I frankly don't know what—where he is going with it."

Kauttu testified that the "before condition" of the Anderson Parties' property would suffer an approximately 35 percent diminution in market value, a percentage he "felt was a very strong indicator of what the impact [would be] on [his] before value." He also testified that he calculated a "50 percent reduction" in the number of mitigation credits available as a result of the taking.

On August 17, the Authority filed motion in limine no. 1 to exclude Kauttu's valuation opinions based on his use of the developer's approach. The Authority argued that, instead of valuing the property in its present condition as raw, undeveloped land, Kauttu evaluated the property as a completed mitigation site. The Anderson Parties "then calculate the loss of imagined mitigation credits as an element of 'damages' they seek to recover as compensation in this action." According to the Authority, Kauttu's valuation method is speculative because it "contemplates the prolonged selling of mitigation credits generated by an unapproved development of the property as a mitigation site" and "[t]here is no verifiable data to support the assumptions about the types of credits that might be approved or the demand for said credits."

On September 14, the Authority filed its supplemental motion in limine no. 1 to exclude Kauttu's opinions using the developer's approach that he presented at deposition. The Authority explained that at his deposition, Kauttu acknowledged he relied on the mitigation plan outlined by DeGraff, in violation of *Bar-C*. The Authority also argued that many of Kauttu's opinions were speculative. Moreover, the Authority asserted that "Kauttu could not make up his mind what he did. . . . [I]f he used the developer's approach, it is excluded under *Bar-C*. If it is unnecessary to his opinion, it should be precluded under Evidence Code Section 352."

25

The Anderson Parties opposed the Authority's supplemental motion in limine no. 1. They acknowledged that "Kauttu's opinions are indeed based on both the 'comparable sales' or 'market data' approach, and a variation of the 'income' approach." They argued, however, that Kauttu's use of the income approach did not involve the level of speculation found in cases such as *Bar-C*. The Anderson Parties also argued it is proper to use the "income approach" merely as a check or method of confirming his conclusions based on the comparable sales approach. Further, they contended that, since "private sales" are hard to come by and the highest and best use of the property was disputed, "the value of [the Anderson Parties'] property 'may be determined by any method of valuation that is just and equitable'" pursuant to Evidence Code section 823.

The trial court heard arguments on the Authority's motion and supplemental motion in limine no. 1. The court granted the motion, but reserved ruling on whether opinions based on the developer's approach were admissible for the limited purpose of establishing the Anderson Parties' position on the highest and best use of the property.

Thereafter, the Authority filed motions in limine nos. 5 and 6.[12] Motion in limine no. 5 sought to exclude new opinions Kauttu had presented in his "updated file memorandum" served on September 14 or 15. The motion also requested that the court clarify whether its earlier ruling on motion in limine

---

[12] The Anderson Parties did not include motions in limine nos. 5 and 6 in the appellate record. However, we find the record is adequate for us to consider the Anderson Parties' claims of error. As explained below, the reporter's transcript reflects extensive discussions between the court and parties concerning issues raised in both motions over several days at trial, as well as the court's findings on those issues.

no. 1 precluding use of the developer's approach extended to Kauttu's recently introduced opinions.

In motion in limine no. 6, the Authority sought to "preclude [the Anderson Parties] from offering further evidence of a specific plan of development" through the testimony of Kauttu and the additional testimony of DeGraff, who had testified earlier at trial. In opposition to motions in limine nos. 5 and 6, the Anderson Parties submitted Kauttu's declaration. Kauttu attempted to clarify earlier statements and testimony that "seem to have created some confusion" as to whether he applied the income approach. He averred that he used both the income approach and comparable sales analysis.

The court heard arguments on motions in limine nos. 5 and 6 and the issues remaining from the earlier motions over several days at trial. It expressed, "I think these motions in limine are also a concern with an end run being made around the statute in some kind of subject matter discussion. For example, if it's a discussion of highest and best use, the concern is that impermissible testimony would be put before the jury." After extensive discussions, the court granted motion in limine no. 5 and excluded Kauttu's "testimony with regard to severance damages" because they were based on the impermissible developer's approach. The court also precluded the opinions not disclosed in Kauttu's August [15] updated statement of valuation data, finding they had not made a good faith effort to comply with the requirements for exchange valuation data and therefore caused prejudice to the Authority.

The court also conducted an Evidence Code section 402 hearing where Kauttu testified as to his opinions. During the hearing the Authority's counsel addressed Kauttu's opinion that " '[t]he subject property lost almost

exactly one-half of the potential mitigation credits as a result of the taking.' " Kauttu was asked, "That is based upon the 320, 160 in the 'after' condition, which is based upon specific plans of development; is that correct, sir?" He replied, "Yes."

The court expressed that it did not "hear anything in the 402 [hearing] that would change my ruling on motion in limine number one or motion in limine number five . . . ." [13]

### c. *The Trial Court Properly Granted Motions in Limine Nos. 1, 5 and 6*

The Anderson Parties do not dispute that Kauttu valued the Anderson Parties' property using the developer's approach, despite Kauttu's "ambigu[ous] or confus[ing]" explanations and testimony. The Anderson Parties also do not dispute that Kauttu's opinions relied on a specific plan of development, DeGraff's Draft Prospectus. They further acknowledge that *Bar-C* held that " 'evidence of value in terms of the money which the land would bring for a specific purpose or as a result of a projected specific plan of development is not admissible[.]" (*Bar-C, supra*, 5 Cal.App.4th at p. 658.)

Despite these concessions, the Anderson Parties nonetheless argue that the opinion proffered by Kauttu utilizing the developer's approach was admissible. First, they attempt to distinguish *Bar-C* from the present case. They suggest that, here, unlike in *Bar-C*, evidence of a developed mitigation bank as a basis for computing the value of the subject property was not

---

[13] The trial court did not make a ruling on motion in limine no. 6. It appears its ruling was dependent upon the Anderson Parties' offer of proof as to the additional testimony of DeGraff. After twice being invited to make an offer of proof, defense counsel replied, "Well, Your Honor, I don't know that there's anything that he can talk about, because it all goes to severance damages." Thereafter, counsel explained that "we may end up having to stipulate to judgment at this juncture."

28

conjectural. For example, the Anderson Parties cite the Draft Prospectus's "very detailed and extensive" analysis, a regulatory agency's "favorable response thereto" after reviewing the Draft Prospectus, and the existence of an approved mitigation site on property directly located next to the Anderson Parties'.

Here again, the Anderson Parties do not provide citations to the record that support their factual statements. Instead, they cite to arguments raised in their opposition to supplemental motion in limine no. 1. As explained above, the Anderson Parties' failure to provide proper record citations forfeits their contentions. (*Professional Collection Consultants*, *supra*, 8 Cal.App.5th at p. 970; *Nwosu*, *supra*, 122 Cal.App.4th at p. 1246.)

In any event, we reject the Anderson Parties' attempt to distinguish this case from *Bar-C*. While cases, including *Bar-C*, have recognized that the trial court has discretion to admit finished subdivision sales as a basis for valuating unimproved property where the "developer was farther along in the subdivision process," that situation does not describe the circumstances here. (*Bar-C*, *supra*, 5 Cal.App.4th at p. 658; see, e.g., *Buena Park School Dist. v. Metrim Corp.*, *supra*, 176 Cal.App.2d at p. 258 [not only had a tentative map been approved but an adjacent golf course was well on the way toward completion, the property had been surveyed, the engineering work was done and a considerable amount of grading was completed; the property had been marked out into lots and some streets were ready for paving; utilities, sewer and water lines had been brought to the edge of the property]; see also *Escondido*, *supra*, 129 Cal.App.4th at p. 984 [because the condemned property was near completion of its improvements on the date of service of summons and complaint, the appraiser adjusted comparable sales prices from

29

fully improved property by deducting the cost, which was undisputed, to finish those improvements].)

Here, by contrast, the Anderson Parties were not "far[] along" in their development process. (*Bar-C.*, *supra*, 5 Cal.App.4th at p. 658.) According to Kauttu, the Anderson Parties were in "the very . . . beginning steps" of their four-year mitigation approval process. As noted above, although the Anderson Parties claim the Draft Prospectus received positive feedback from a reviewing regulatory agency, the Anderson Parties had not obtained a permit or other approval to begin developing their property into a mitigation site. In addition, the property was not generating any income from its potential as a mitigation site. We therefore disagree that the developments in this case have "sufficiently crossed the threshold toward the sale of [a] finished [mitigation site] as to render the developer's approach an acceptable method of valuation. (*Bar-C*, *supra*, 5 Cal.App.4th at p. 659.)

The Anderson Parties next argue that a valuation opinion based on the developer's approach may be admissible for the limited purpose of supporting a party's position on the highest and best use of the property, where such issue is disputed. "The highest and best use is defined as 'that use, among the possible alternative uses, that is physically practical, legally permissible, market supportable, and most economically feasible.' " (*San Diego Gas & Electric Co. v. Schmidt*, *supra*, 228 Cal.App.4th at p. 1289; accord, *County of San Diego v. Rancho Vista Del Mar, Inc.* (1993) 16 Cal.App.4th 1046, 1058 (*Rancho Vista*).)

As we have explained, a property owner may not value his or her property based upon its use for a projected special purpose. (See *Bar-C*, *supra*, 5 Cal.App.4th at p. 657.) But "[w]hile a property owner may not generally present evidence of the value of his [or her] property ' "in terms of

30

money" ' that the property would bring for a special purpose [citation], evidence of a particular use may be relevant to establishing the highest and best use since such evidence may tend to establish the property's adaptability for that kind of use." (*Rancho Vista, supra*, 16 Cal.App.4th at p. 1059; accord, *Heilbron, supra*, 156 Cal. at p. 412; *Silveira, supra*, 236 Cal.App.2d at p. 627; cf. *People ex rel. Dept. of Public Works v. Princess Park Estates, Inc.* (1969) 270 Cal.App.2d 876, 884–885 [evidence of specific plans held inadmissible because they were offered for the purpose of enhancing severance damages].) Thus, "[w]hether construction plans are admissible depends on the purpose for which they are offered." (*People ex rel. Dept. of Transportation v. Tanczos* (1996) 42 Cal.App.4th 1215, 1218.) The following cases are instructive.

In one case cited by the Anderson Parties, *City of Los Angeles v. Decker* (1977) 18 Cal.3d 860 (*Decker*), "[t]he principal valuation issue at trial was the highest and best use to which the properties could be put." (*Id.* at p. 864.) The defendant's appraiser testified that the highest and best use was for the construction of airport related facilities. (*Ibid.*) The city's appraiser testified that "it would be very unlikely that any developer would undertake the development of airport related facilities[.]" (*Ibid.*) The city's position was that the highest and best use of the property remained residential. (*Ibid.*) Under those circumstances, the adaptability of the property for airport parking purposes was admissible. (*Id.* at p. 869.)

In *City of Pleasant Hill v. First Baptist Church* (1969) 1 Cal.App.3d 384 (*Pleasant Hill*), another case cited by the Anderson Parties, the court explained, " '[i]t is true that evidence of a proposed use may be relevant, not to enhance damages but to show that the proposed use is feasible and, as such, might enter into a determination of the market value.' [Citation.]" (*Id.* at p. 399.) In that case, " 'all the experts agreed that the land was

31

suitable and valuable, before but not after the condemnation, for the building of a motel and restaurant project, and that this would have been a feasible plan for the use of the property.' " (*Id.* at pp. 399–340.) Accordingly, it " 'appears that the sketch of a specific plan or development could have no other purpose than to attempt to enhance damages, and its rejection was proper.' [Citations.]" (*Id.* at p. 400.)[14]

Here, like *Pleasant Hill*, but unlike *Decker*, no one disagreed that the property was feasible for mitigation purposes, although the Authority's appraiser opined that agricultural use would have ultimately yielded more profit. It therefore follows that the Anderson Parties' attempts to introduce Kauttu's economic analysis relying on the Anderson Parties' specific plans for developing the property as a mitigation bank " 'could have no other purpose than to attempt to enhance damages[.]' " (*Pleasant Hill*, *supra*, 1 Cal.App.3d at p. 400.) The purpose for which the Anderson Parties offered Kauttu's economic analysis was not to establish that their specific development plan for mitigation was feasible, but rather to show that the severance from the taking would damage the prospect of such a development. (See *id.* at

---

[14] We would reach the same conclusion as to DeGraff, whose testimony the Anderson Parties attempted to elicit to show how the taking would have negatively "impact[ed] the [Anderson Parties'] ability to get a [mitigation] bank approved and the types of credits and whether or not it can have tidal connection." As noted above, the Anderson Parties stated such testimony "all goes to severance damages." Because evidence of a specific plan is inadmissible to enhance severance damages, we view counsel's comment as a concession that DeGraff's additional testimony was offered for an impermissible purpose. (See *Pleasant Hill*, *supra*, 1 Cal.App.3d at p. 399; see also *Rancho Vista*, *supra*, 16 Cal.App.4th at p. 1059.) Under those circumstances, the Anderson Parties have effectively abandoned any argument that DeGraff's additional testimony was admissible. (See *Fleming v. Superior Court* (2010) 191 Cal.App.4th 73, 99 [concession of point is effective abandonment of issue].)

pp. 399–400; *Rancho Vista*, *supra*, 16 Cal.App.4th at p. 1058.) Kauttu's valuation opinions were thus inadmissible on this basis.

Even if evidence of the Anderson Parties' specific plans was relevant and admissible, it was excludable under Evidence Code section 352. First, the evidence would have been cumulative. (Evid. Code, § 352.) DeGraff testified at trial about the property's potential as a mitigation site as part of his preparation of the Draft Prospectus. Anderson also testified that the property's potential as a mitigation bank was "well known in the community" at the time he purchased the property.

Second, the risk of prejudicing the jury substantially outweighed any probative value in the evidence of the Anderson Parties' specific plans. (Evid. Code, § 352.) As this court explained in *Emeryville*, *supra*, 101 Cal.App.4th 1083, "We believe the lesson of *Decker* and similar cases is that evidence of specific project plans is inadmissible in the absence of specific facts or points of contention that demonstrably enhance the probative value of the evidence to a point where it outweighs the inherent potential for prejudice. That test is not satisfied merely because the plans 'illustrate' or 'demonstrate' an *undisputed potential use* for the property. If evidence of project plans could be introduced on that rationale, it would seem to be admissible in *every* case, and the rule to which *Decker* is an exception would cease to exist." (*Id.* at p. 1105, first italics added, second italics in original.)

Here, evidence of the Anderson Parties' project plans would have merely " 'illustrate[d]' or 'demonstrate[d]' an undisputed potential use for the property." (*Emeryville*, *supra*, 101 Cal.App.4th at p. 1105.) Such evidence therefore had limited probative value. Further, given the speculative nature of Kauttu's valuations, any probative value in the evidence was substantially outweighed by the risk of prejudicing the jury. (See *Rancho Vista*, *supra*,

33

16 Cal.App.4th at p. 1059 [" 'Speculative and conjectural calculations of prospective receipts and expenditures and consequent profits to be derived from a prospective enterprise not only throw no light on the issue of the market value of the land to be used in the enterprise, but operate to confuse and mislead the mind of the jurors' "].)  Indeed, the trial court recognized the risk of prejudice, explaining that "if it's a discussion of highest and best use, the concern is that impermissible testimony would be put before the jury." The evidence was therefore properly excluded under Evidence Code section 352.

The Anderson Parties' additional attempts to avoid *Bar-C's* prohibition on the use of the developer's approach are also unpersuasive.  The Anderson Parties contend, for example, that *Bar-C* should not apply when evidence of comparable sales is not available to assess the condemned property's market value.  In support of this argument, the Anderson Parties rely on the exception in Evidence Code section 823.  Again, that statute provides that "the value of property for which there is no relevant, comparable market may be determined by any method of valuation that is just and equitable."  (Evid. Code, § 823.)  As we explained above, this exception does not apply because there *was* evidence of relevant, comparable sales of properties.

The Anderson Parties also cite several cases for the proposition that valuation evidence generally held impermissible could still be admitted "where there is a greater need for [it]" and to "ensure the equitable nature and goals of the [T]akings [C]lause [of the Fifth Amendment to the United Sates Constitution]."  But none of the cited cases supports such a proposition. Contrary to the Anderson Parties' suggestions, the court in *Redevelopment Agency v. Contra Costa Theatre* (1982) 135 Cal.App.3d 73, 83–86 affirmed the admission of a landowner's expert's testimony after applying established

34

evidentiary principles, not because of the party's "need for [the evidence]." *Action Apartment Assn. v. Santa Monica Rent Control Bd.* (2001) 94 Cal.App.4th 587 does not address permissible valuation methods of appraisers in eminent domain cases.  The quoted reference " 'to the dictates of " 'justice and fairness' " ' " appeared in the context of discussing a principle underlying the Takings Clause in general, not to any application of evidentiary standards.  (U.S. Const., 5th Amend., *id.* at p. 601.)  *Thor v. Boska* (1974) 38 Cal.App.3d 558 and *Burke v. Almaden Vineyards, Inc.* (1978) 86 Cal.App.3d 768 are readily distinguishable in that they are personal injury, not eminent domain cases, that do not address the evidentiary issue before us.

On this basis, we also reject the Anderson Parties' argument that the developer's approach is allowed when used merely to "check" or "validate" the values of land determined by the use of comparable sales.  There are several problems with this argument.

First, it is unclear from the record whether Kauttu in fact used the income approach as a "check" against values based on the comparable sales approach.  In his declarations and at the Evidence Code section 402 hearing, Kauttu stated he used the inverse of that method, namely that he "us[ed] the income approach as a primary approach and the sales comparison approach as a secondary approach."

In addition, Kauttu stated in his appraisals and at his deposition that he could not use the sales comparison approach to calculate severance damages.  At the evidentiary hearing, for example, Kauttu testified he previously opined in his reports that " '[t]he "after" condition value of the property could not reasonably be estimated by direct comparison,' " a statement that he later disavowed as "not reflect[ing] [his] state of mind or

35

all of the body of [his] work[.]" If, as Kauttu originally asserted, he could not use the comparable sales approach to calculate severance damages, then he could not have used the income approach as a "check" against values based on comparable sales. As the Authority argued below in its in limine motions, "Kauttu could not make up his mind . . . [about] what he did."

Kauttu's adoption of inherently inconsistent positions alone would have justified exclusion of any purported reliance on the income approach as a mere check on values derived from a comparative sales approach. At a minimum, Kauttu's conflicting statements and testimony would have been inadmissible under Evidence Code section 801, subdivision (a), because they "would [not have] assist[ed] the trier of fact." At most, any probative value in the evidence would have been substantially outweighed by the risk of misleading the jury and confusing the issues. (Evid. Code, § 352.)

Indeed, the trial court discerned from Kauttu's shifting opinions an ad hoc attempt by the Anderson Parties to substantiate their 35 percent diminution of value through claiming use of an alternative method to the developer's approach. The court explained, "If [Kauttu] uses an impermissible method and comes up with 35 percent and then you guys try to clean it up and he comes up with the same amount—the same percentage, that doesn't sound appropriate." In another instance, the court stated to the Anderson Parties' counsel, "You're telling me he . . . used an improper methodology to come up with 35 percent. But you're saying he can get back to that same number a different way?"

The record discloses that the "different way" the Anderson Parties took to arrive at the 35 percent diminution of value was unreliable and misleading. If Kauttu was relying on the comparable sales approach, followed by a "bracketing" or "adjustment" method, to formulate a severance

damages calculation, then he was required to identify the purportedly comparable sales forming the basis of that calculation.  He failed to do so.

As explained above, there was competent comparable sales evidence available, including two sales of other properties which Kauttu provided as Items 4 and 5 of his updated appraisal.  Items 4 and 5 referred to sales in the amounts of roughly $6,500 and $11,000 per acre with mitigation as the properties' highest and best uses, and the parties did not dispute were comparable.  Kauttu, however, testified he did not rely on those two sales to calculate the diminution of value, but rather "on something that is outside of the report[s]" he produced.  Kauttu testified he relied on his "25 years of experience appraising mitigation properties, including six mitigation properties in Suisun Marsh in the last few years . . . . And [he] can't un-know that."  But Kauttu did not include those allegedly comparable sales in any of his appraisals; nor did he explain them at the evidentiary hearing, though acknowledging he was required to disclose them.  The Anderson Parties have therefore failed to substantiate their claim that Kauttu used the income approach as a mere check on the comparative sales approach.

Further, there were misleading aspects of such an approach, thereby confirming the trial court's observations that the Anderson Parties were attempting to "clean . . . up" an otherwise impermissible severance damages conclusion.  For example, Kauttu justified use of the bracketing approach on the ground comparable sales data was lacking.  This premise is misleading, because, contrary to Kauttu's claim, there was evidence of comparable sales, which he acknowledged.  Yet, he testified he did not rely upon those sales.  Instead, he relied on other sales of properties that he had never previously disclosed or attempted to explain.  Then, rather than adjust those allegedly comparable sales to make them as similar to the subject property as possible,

it appears Kauttu did the opposite by injecting "qualitative adjustments," which required looking at "how much of a percentage difference is there [in the] before and after" conditions of the property.

Notably, Kauttu testified that the differences between the property's before and after conditions were based on "conversations with [DeGraff and his consulting firm] about a probable plan of development." Although Kauttu stated elsewhere "we didn't use that," he immediately testified thereafter, "I had that study and that information available. And where I used it was just to look at the difference between the 'before' and 'after' values." According to Kauttu, the result of applying the adjustments was that "the mitigation potential of the property [was] severely, severely impacted, severely reduced." In particular, Kauttu determined a 35 percent diminution of value, which fell in between "the upper range of the impact on value of the take [of] 50 percent" and "[a] nominal lower bracket [of] 10 percent." Ultimately, therefore, Kauttu's use of "qualitative adjustments" to calculate severance damages still was based on a specific plan of development.

Given these circumstances, the trial court's misgivings about the Anderson Parties' attempts to "clean . . . up" their severance damages calculation were appropriate. As Kauttu confirmed, "my qualitative adjustment just corroborated what I had discovered using the inadmissible approach." The court justifiably found Kauttu's opinions "misleading." The opinions were properly excluded based on their substantial risk of prejudicing the jury. (Evid. Code, § 352.)

Lastly, the Anderson Parties' reliance on their constitutional right to just compensation does not exempt them from complying with evidentiary standards for appraisal methods. As explained in *Foley, supra*, 212 Cal.App.4th 393: "[T]he 'involvement of a constitutional right does not

38

change the rules of evidence in an eminent domain proceeding. It does not deny due process to cut off a litigant's right to present evidence where the party fails to comply with established evidentiary standards for appraisal methods. Thus, when a valuation expert employs an unsanctioned methodology, the opinion may be excluded in part or in whole in the discretion of the trial court.' " (*Id.* at p. 398.)

In sum, we conclude that the trial court was within its discretion to exclude Kauttu's opinions based on the developer's approach.

### 4. Motion in Limine No. 3: Exclusion of Undisclosed Expert Opinions

The Anderson Parties' final attack on the exclusion of Kauttu's proffered testimony rests on the contention that he should have been permitted to present his opinions concerning "[the Authority's] taking of [their] water rights, and how [the Authority's] project design and operation would severely . . . [and] negatively impact [the Anderson Parties'] mitigation bank and property value." We disagree.

In its motion in limine no. 3, the Authority argued in part that Kauttu was not permitted to testify about certain claims that the Anderson Parties had made in their Trial Management Conference Statement. In that statement, the Anderson Parties noted DeGraff and Kauttu had opined that, " 'but for' " the taking, the Anderson Parties' plans to develop their property as a mitigation bank, under the "Rancho Suisun Mitigation Bank Draft Prospectus" prepared by DeGraff, would result in "significant revenue and increased [fair market value]." The Anderson Parties also argued that the complaint was defective by failing to mention the Authority's attempt to acquire "water rights"; the Authority violated an existing easement; the Authority's and Grizzly Bay's project would increase flooding risks to the Anderson Parties' property; and the Authority would not pay a fair amount

for the increased costs to pump out additional water. The Anderson Parties stated that "Kauttu opines that these severance damages amount to several million dollars."

The Authority asserted that because the Anderson Parties had failed to disclose that Kauttu would be offering valuation opinions on those grounds, the evidence was inadmissible. (§ 1258.250, subd. (b).) In the motion, the Authority also quoted Kauttu's deposition transcript where he testified that he was not aware of the " 'water right issue' " and had " 'exclude[d] it from [his] value opinion.' " In opposition to the motion, the Anderson Parties submitted a copy of Kauttu's list of "corrections" to his deposition transcript. In that document, Kauttu acknowledged he had indeed testified that he excluded the "water rights" and "design issues" from his opinions. Kauttu explained, however, that his "intent was to say that the issues do impact value" and that he was "seeking additional information sufficient to estimate a price impact on value." The trial court reserved ruling on motion in limine no. 3.

The court then revisited the question whether to exclude Kauttu's previously undisclosed opinions in connection with the Authority's motion in limine no. 5. As revealed in discussions between the court and parties at trial, Kauttu provided new valuations that factored in the water rights and project design issues in his September 14, 2018 updated file memorandum, which was the subject of the Authority's motion in limine no. 5. The court excluded the memorandum because Kauttu's use of previously undisclosed factors to form new valuation opinions violated the statutory expert disclosure requirements and prejudiced the Authority. (See § 1258.210 et seq.)

40

As noted above, the trial court did not make a definitive ruling on the Authority's motion in limine no. 3. It appears from the record, however, that the court did address the objections that the Authority raised in motion in limine no. 3 in connection with motion in limine no. 5. Even if we were to construe the court's ruling on motion in limine no. 5 as a ruling on motion in limine no. 3, as the parties do, we would find no basis for reversal.

Initially, we note that the appellate record does not include the relevant deposition testimony, the Authority's motion in limine no. 5, or Kauttu's September 14 updated file memorandum. The record does, however, contain Kauttu's list of corrections to his deposition testimony, acknowledging he admitted to excluding the alleged water rights dispute and the impacts of the Authority's and Grizzly Bay's project design from his original severance damages calculations, but explaining such omission was not intentional. The record also contains oral proceedings at trial during which the court and parties extensively discussed the nature of Kauttu's additional opinions and the court's factual and legal findings. From what we can glean from the record, the trial court reasonably precluded Kauttu from testifying about any new opinions that the Anderson Parties had failed to previously disclose.

The Anderson Parties were required to exchange their expert witness valuation data as of the July 26 exchange date agreed upon by the parties. (§§ 1258.220, subd. (a), 1258.250.) Section 1258.280 provides that upon an objection, "[n]o party required to serve statements of valuation data on the objecting party may call a witness to testify on direct examination during [its] case in chief to his [or her] opinion on any matter listed in Section 1258.250 unless a statement of valuation data for such witness was served." (§ 1258.280, subd. (b).)

The Anderson Parties concede that Kauttu presented "belated" opinions, in violation of the statutory requirements. They argue, however, that Kauttu should have been allowed to testify about those new opinions for at least two reasons. First, the Anderson Parties rely on section 1258.280, subdivision (c), which allows an expert to testify about an undisclosed opinion merely to explain or elaborate on an earlier disclosed opinion. Such reliance is misplaced. Kauttu's additional opinions concerning the alleged water rights and project design issues were not merely explanatory of his earlier opinions; rather, they were "wholesale additional" opinions.

Second, the Anderson Parties rely on section 1258.290, subdivision (a), which permits an expert witness to testify to an opinion not previously disclosed "if the court finds that such party has made a good faith effort to comply with Sections 1258.210 to 1258.260 [disclosure requirements], . . . that he has complied with Section 1258.270 [notice requirements for presenting additional witnesses and data], and by the date of exchange he [or she]: [¶] (1) Would not in the exercise of reasonable diligence have determined to call such witness or discovered or listed such opinion or data; or [¶] (2) Failed to determine to call such witness or to discover or list such opinion or data through mistake, inadvertence, surprise, or excusable neglect." In making these determinations, "the court shall take into account the extent to which the opposing party has relied upon the list of expert witnesses and statements of valuation data and will be prejudiced if the witness is called . . . ." (§ 1258.290, subd. (b).)

The Anderson Parties assert that their failure to timely disclose Kauttu's additional opinions was inadvertent and not based on "bad faith." But the Anderson Parties fail to provide record citations to support their factual and procedural assertions, thereby forfeiting them. (*Professional*

*Collection Consultants*, *supra*, 8 Cal.App.5th at p. 970; *Nwosu*, *supra*, 122 Cal.App.4th at p. 1246.)  Section 1258.290, subdivision (a) and the related statutory subdivisions cross-referenced therein provide a considerable degree of discretionary flexibility to accommodate late-surfacing expert opinion on valuation, but at some point the trial court must make a call one way or the other whether litigants forced to deal with such opinions are being placed in an unfair position.  We cannot say the court made the wrong call here.  As explained by the court, Kauttu's new opinions were "not a nonprejudicial 'mathematical recalculation.' " (*City of Santa Clarita v. NTS Technical Systems* (2006) 137 Cal.App.4th 264, 277–278.)  Rather, they were "a wholesale additional analysis of a subject matter which was not present in his August 2018 statement [of valuation data]."  While the court acknowledged the Anderson Parties' explanation that "discovery was stayed for over two years while settlement negotiations occurred," it declined to credit that explanation.  We do not "rejudge the trial court's determination." (*Id*. at p. 276.)

The record supports the court's finding that the Anderson Parties' omissions were prejudicial.  The court noted that Kauttu had presented his updated appraisal just four days before trial, thereby preventing the Authority from redeposing or retaining additional experts.  (See *City of Santa Clarita v. NTS Technical Systems*, *supra*, 137 Cal.App.4th at p. 277 ["the untimely service of the statement might deprive the other party of the opportunity to counter its contents and effect"]; *Bonds v. Roy* (1999) 20 Cal.4th 140, 148 ["Allowing new and unexpected testimony for the first time at trial" inconsistent with requirement of "timely disclosure of the general substance of an expert's expected testimony" in order for "parties . . . properly [to] prepare for trial"].)

43

## C. *Ex Parte Application To Continue Expert Exchange and Trial*

The Anderson Parties challenge the validity of the local court rules governing the procedures for filing and hearing ex parte applications. They contend that in applying the new rules, the court delayed its consideration of the ex parte request to continue the expert exchange and for a trial continuance and that the delay effectively mooted their request. These claims lack merit.

On July 24, the Anderson Parties filed an ex parte application for an order continuing the July 26 expert exchange and September 19 trial dates. On July 31, the trial court conducted a hearing and explained that, "We have a new rule of court for the civil division where we have a hearing to see if we would set it for an ex parte hearing." Accordingly, the trial court set the hearing for August 24 and ordered the parties to prepare moving papers and opposing papers prior to the hearing. The Anderson Parties later requested the court take the matter off calendar.

The Anderson Parties argue that "[t]he court's new ex parte rules inexplicably delayed, and thus essentially rendered moot and effectively denied" their ex parte request. We presume that the local rule of court at issue, which the Anderson Parties do not identify, is rule 3.14 of the Superior Court of Solano County, Local Rules. That rule provides that "[e]x parte applications submitted to seek scheduling relief from court setting guides or caps . . . may be summarily granted without a hearing. [¶] An ex parte hearing shall be conducted only following the filing of the ex parte application and supporting paperwork, any underlying related motion, and proof of satisfaction of any filing fees." (Super. Ct. Solano County, Local Rules, rule 3.14, Civil Cases, Ex Parte Matters (local rule 3.14).)

The Anderson Parties did not object to, or otherwise raise their concerns about, the trial court's new procedures. Indeed, the Anderson

44

Parties agreed to proceed on the matter as ordered by the court in accordance with the new local rule. The Anderson Parties thus acquiesced to the court's procedures, resulting in forfeiture of their challenges on appeal. (See *Children's Hospital and Medical Center v. Bontá* (2002) 97 Cal.App.4th 740, 776 [" 'An appellate court will not consider procedural defects or erroneous rulings where an objection could have been, but was not, raised in the court below' "].)

As to the merits, the Anderson Parties fail to explain how local rule 3.14 is itself invalid. The absence of cogent legal argument allows us to treat the Anderson Parties' challenges to the validity of the local rule as forfeited. (*Cahill*, *supra*, 194 Cal.App.4th at p. 956.) In any event, we see no error in the manner in which the trial court conducted the proceedings with respect to the ex parte request. The Anderson Parties were given an opportunity to file a noticed motion and a reply to any opposition and have their arguments heard at a formal hearing at least three weeks before trial. The Anderson Parties simply failed to avail themselves of this opportunity. Because the Anderson Parties' inability to obtain the relief they sought was due to their own inaction, their claims of prejudice are not well taken.

### D. *Ruling on Right-to-take Objections*

Finally, the Anderson Parties argue that the trial court prejudicially erred in untimely hearing and ruling on their right-to-take objections. As explained below, the Anderson Parties have forfeited these claims of error.

We briefly summarize the procedures relating to the resolution of necessity and assertion of right-to-take defenses in eminent domain cases. A public agency can take private property only if (1) the property is necessary for a public project; (2) the project is in turn necessary for a public purpose; and (3) the taking of the particular property is compatible with the greatest public good and the least private injury. (§ 1240.030.) A public agency must

45

hold a hearing to consider whether the taking meets these three criteria. (§ 1245.235.) After the hearing, if the agency decides the taking meets the criteria, then it must adopt a resolution of necessity (§§ 1240.040, 1245.220), which is a prerequisite to bringing a condemnation action. (§§ 1240.040, 1245.220).

Where resolution of necessity is adopted, a person having an interest in property described in a resolution of necessity may still obtain judicial review of the validity of the resolution by asserting objections to the right to take. (§ 1245.255.) "Where objections to the right to take are raised, unless the court orders otherwise, they shall be heard and determined prior to the determination of the issue of compensation. [¶] (b) The court may, on motion of any party, after notice and hearing, specially set such objections for trial." (§ 1260.110.) These objections are heard and determined by the court. (§ 1260.120, subd. (a).)

In their answer to the complaint, the Anderson Parties asserted several right-to-take objections as affirmative defenses. (§§ 1250.350, 1250.360.) For example, the Anderson Parties argued that the Authority failed to proceed in a manner required by law and was not authorized to take the Anderson Parties' property by eminent domain (fifth affirmative defense) and that the adoption of the resolution of necessity was invalid (sixth affirmative defense) and contrary to law (tenth affirmative defense).

Thereafter, the Anderson Parties moved to specially set a trial on their right-to-take objections. The trial court denied the motion.

In the three years that followed, the Anderson Parties did not renew their request to specially set a trial on their right-to-take objections or otherwise have their objections heard earlier. It was not until after a jury

46

trial commenced on September 19, that the Anderson Parties requested a hearing on their objections. The court agreed to hold a hearing.

After hearing arguments on the objections the following day, the court overruled the objections. It further commented that the Anderson Parties could have either filed a motion for reconsideration in the trial court, petitioned this court for a writ of mandate to review the order of denial, or otherwise made such a request to have their right-to-take objections heard prior to trial, but failed to do so. The court stated that, even had the Anderson Parties taken any of those approaches, it would have concluded that they were unlikely to show a possibility of prevailing on the issue.

The Anderson Parties first argue that the court erred in denying their May 2015 motion to specially set trial on their right-to-take objections. Because the Anderson Parties do not present any cogent argument to support this claim of error, other than to state that their objections "had clear merit," the Anderson Parties have forfeited the contention. (*Cahill, supra,* 194 Cal.App.4th at p. 956.)

Second, the Anderson Parties contend that the trial court erred by not hearing and determining their right-to-take objections in a timely manner. We conclude this argument also has been forfeited. The Anderson Parties did not request that their objections be heard earlier than the September 14 trial calling. For example, as the court explained, the Anderson Parties could have filed either a renewed motion to specially set trial, a motion for reconsideration of the order of denial, or a writ petition in the appellate court to challenge the order. Additionally, at the trial management conference, the Anderson Parties informed the court they would not be seeking to bifurcate the trial. Moreover, at the September 14 trial calling, the Anderson Parties confirmed they were ready to proceed with the jury trial and did not raise the

need to have their objections heard separately.  Given these circumstances, the Anderson Parties have forfeited the right to challenge the timeliness of the court's ruling on their objections.  (See *Children's Hospital and Medical Center v. Bontá*, *supra*, 97 Cal.App.4th at p. 776 [" 'An appellate court will not consider procedural defects or erroneous rulings where an objection could have been, but was not, raised in the court below' "].)

The Anderson Parties further contend that the court's refusal to timely hear and determine their right-to-take objections "forced [them] into the unnecessary, unreasonable, and unjust position of having to thereafter expend well over $400,000 in attorneys' fees . . . to continue defending itself and pursue constitutionally required just compensation."  This claim of prejudice assumes that the Anderson Parties would have prevailed on the merits of their objections, thereby negating the need to proceed with a trial on just compensation.  The Anderson Parties, however, fail to establish this assumption is valid.  As noted above, the Anderson Parties state in their opening brief that their "defenses had clear merit."  As an example, the Anderson Parties argue that the complaint omits to mention the "taking [of] any water or water rights[.]"  But the Anderson Parties do not provide record citations in support of this argument.  (See *Nwosu*, *supra*, 122 Cal.App.4th at p. 1246.)  Nor do they cogently analyze the nature of this objection, how the objection is meritorious, or how the trial court erred in overruling it.  (*Cahill*, *supra*, 194 Cal.App.4th at p. 956.)

### E. *Fees Requested on Appeal*

As noted above, the Anderson Parties filed an opening brief, followed by an errata to the opening brief.  After the Authority moved to strike the errata, which the Anderson Parties opposed, we ordered the Anderson Parties to file a written response "electing either (1) that its original opening brief shall be stricken, the Errata to Appellants' Opening Brief shall be the

opening brief, Respondent may withdraw the currently filed Respondent's Brief and submit a revised brief addressed to the Errata to Appellants' Opening Brief, and Appellants agree to reimburse Respondent reasonable attorney fees incurred in preparing a revised Respondent's Brief, not to exceed $5,000; or (2) that the Errata to Appellants' Opening Brief shall be stricken." The Anderson Parties elected the first option. The Authority later informed us that because it had preemptively addressed the errata arguments in the respondent's brief, it would not be filing a revised brief. The Authority, however, now requests "that the $5,000 allotment for costs to revise the Respondent's Brief to address the Errata be applied to the costs incurred to address the Errata in the Respondent's initial briefing." Because the Authority was able to respond to the arguments raised in the errata without the need to file a revised respondent's brief, we decline to award it the requested fees, although we do award it costs on appeal as the prevailing party under rule 8.278(a)(2) of the California Rules of Court.

### III. DISPOSITION

The judgment is affirmed. The Authority shall recover its costs on appeal.

STREETER, J.

WE CONCUR:

POLLAK, P. J.
TUCHER, J.

49